J-A05027-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| HUNTER JOHN LEARN | : | |
| | : | |
| Appellant | : | No. 431 WDA 2024 |

Appeal from the Judgment of Sentence Entered March 13, 2024
In the Court of Common Pleas of Blair County Criminal Division at No(s):
CP-07-CR-0000270-2023

BEFORE:  MURRAY, J., KING, J., and FORD ELLIOTT, P.J.E.[*]

MEMORANDUM BY KING, J.:                              **FILED: May 30, 2025**

Appellant, Hunter John Learn, appeals from the judgment of sentence entered in the Blair County Court of Common Pleas, following his jury trial convictions for one count each of aggravated assault, simple assault, and disorderly conduct.[1]  We affirm.

The relevant facts and procedural history of this matter are as follows. On June 4, 2022, at approximately 10:00 p.m., William Benton and Elizabeth Kissell went to the Black and Gold Tavern in Altoona, Pennsylvania.  They were in the bar for several hours.[2]  During this time, Ms. Kissell told Appellant to

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] 18 Pa.C.S.A. §§ 2702, 2701, and 5503, respectively.

[2] During this time, Mr. Benton estimated that he consumed approximately 10 beers.  Ms. Kissell stated that between the two of them, they had ordered three buckets of beer, or 18 cans, and that she had consumed approximately six cans of beer and one shot of hard liquor.

clean up drinks he had apparently spilled, and he complied. She also encountered Brandon Smida, remarking on his long hair and touching it to determine whether it was real. Mr. Smida pulled away and in an aggressive tone told Ms. Kissell to send her boyfriend outside. Mr. Benton and Ms. Kissell left the bar around 2:00 a.m. and went to their car, which was parked in a nearby lot.

In the parking lot, Ms. Kissell recognized Appellant and Mr. Smida. Mr. Benton noticed approximately 10 people milling around in the parking lot, and recognized a staff member, presumably Brian Wike, from the Black and Gold Tavern standing in front of Brandon Smida, talking to him. Mr. Benton thought that Mr. Smida looked aggressive and that the staff member was trying to talk him down. However, Mr. Benton did not see anyone else fighting.

Brian Wike, the bouncer at the Black and Gold Tavern, was walking back to his car with his girlfriend, Amanda Hammel. He observed an argument in the parking lot which appeared to break up as he arrived. However, as Mr. Wike turned around, he heard another fight or altercation breaking out and observed Mr. Benton saying that he and Ms. Kissell just wanted to leave.

At that time, Mr. Smida approached Mr. Benton and Appellant approached Ms. Kissell, saying something like "do you want me to go loco on you" or "don't make me go gangster on you." (N.T. Trial, 11/14/23, at 114, 190). Ms. Kissell kicked at Mr. Smida and told him to get away from her. After that, she did not remember anything except waking up on the ground, where she was being punched.

Mr. Benton said something like "don't bring us into this" before Mr. Smida swung at him and missed. (*Id.* at 114). Mr. Benton attempted to grab hold of Mr. Smida to diffuse the situation until he could figure out what was going on, but he was hit from behind by Appellant. After that, Mr. Benton was on the ground, being punched and kicked by the three men as he covered up and attempted to protect his head. From the ground, he saw that Ms. Kissell had also been attacked.

Mr. Wike also observed Mr. Benton being knocked to the ground, punched and kicked in the head and upper torso, his head bounced off the asphalt. He identified Appellant, Mr. Smida, and Jeremy Fornbacher as the assailants. As Mr. Wike attempted to break up the assault, he heard someone say, "Oh my god, he punched her in the face," and turned around to see someone hitting Ms. Kissell. (N.T. Trial, 11/15/23, at 72). Mr. Wike saw many fights during five years working security, but this incident was the worst, a "stomping." (*Id.* at 76).

When the assault ended, Ms. Kissell's blood was spattered over the side of Mr. Benton's car. Ms. Hammel attempted to comfort Ms. Kissell while the assailants and other bystanders began to pile into a dark colored Buick. During this time, Appellant was speaking to Mr. Wike. However, the people in the car yelled at him to get in the car and he did so. The Buick then fled.[3]

_____

[3] Subsequently, police officers stopped the blue Buick, license plate number JDK-8395, that had fled the scene of the assault and interviewed the occupants.

At that point, police officers arrived, spoke to the victims, and called for an ambulance to attend to Ms. Kissell. Mr. Wike drove Mr. Benton to the hospital and Ms. Kissell was transported by ambulance. Both Mr. Benton and Ms. Kissell were diagnosed with broken noses.[4]

Detective John Burns was assigned the case on June 13, 2022. During his investigation, he interviewed the victims as well as other witnesses, including the bartender on duty that night,[5] and was ultimately able to identify Appellant and his co-defendants as the assailants. He also viewed the security video footage and identified Appellant as one of the assailants who hit and kicked Mr. Benton.

Subsequently, Appellant was arrested and charged with two counts each of conspiracy, aggravated assault, simple assault, and harassment, and one count of disorderly conduct. On November 13, 2023, the case proceeded to a jury trial.

Appellant testified at trial that Mr. Benton had come up behind him and put him in a chokehold without warning, and that he had been scared and

---

[4] Ms. Kissell later required surgery to repair her nose and still deals with vision problems. Mr. Benton gets headaches daily, and deals with sinus difficulty. Both Mr. Benton and Ms. Kissell have dealt with anxiety and panic attacks following the incident.

[5] Breanna Kos, the bartender, recognized Appellant and Mr. Smida through mutual friends and through her place of work, and also identified them on the security footage as the assailants. The security footage was introduced at trial as Commonwealth's Exhibit 11 and Joint Defense Exhibit 1, but it is not contained within the certified record. Following an inquiry, this Court was unable to obtain the security footage. Nevertheless, Appellant does not dispute any testimony concerning what is portrayed in the security footage.

acted in self-defense. During his testimony, the Commonwealth questioned Appellant regarding his claim of self-defense, and whether he had mentioned it to the police. Appellant's counsel objected when it seemed that Appellant was confused by the Commonwealth's line of questioning. The trial court asked whether Appellant had given a statement to police, and when defense counsel responded that he had not, the trial court cautioned the Commonwealth that it had to be "careful asking these questions when he has a right to remain silent."[6] (N.T. Trial, 11/16/23, at 78). The Commonwealth argued that Appellant had chosen to testify, and that counsel was not asking whether he talked to police, but inquiring if this was the first time Appellant had mentioned being a victim. The parties argued further about whether the line of questioning was permissible, and the court cautioned the Commonwealth to be careful with these types of questions because of the inference that could be raised. (*See id.* at 80-81). At that time, Appellant moved for a mistrial to "preserve [Appellant's] issues[.]" (*Id.* at 81). Following argument at sidebar, the trial court sustained Appellant's objection to the question, denied the motion for a mistrial, and agreed to issue a cautionary instruction to the jury regarding Appellant's Fifth Amendment right to remain silent. (*Id.* at 89-90).

On November 16, 2023, the jury convicted Appellant of one count each of aggravated assault (Mr. Benton), simple assault (Mr. Benton), and

---

[6] Notably, Appellant had not specified that his objection was based on any reference to Appellant's post-arrest silence.

disorderly conduct, and acquitted him of the remaining charges. On March 13, 2024, the court sentenced Appellant, with the benefit of a pre-sentence investigation report, to an aggregate 22 to 44 months of incarceration, followed by three years of probation.

On April 10, 2024, Appellant filed a request to file a *nunc pro tunc* post-trial motion, however, the court never ruled upon this motion. On April 11, 2024, Appellant timely filed a notice of appeal. On April 15, 2024, the court ordered Appellant to file a Pa.R.A.P. 1925(b) statement of errors complained of on appeal. On April 25, 2024, Appellant timely complied.

On appeal, Appellant raises the following issues for our review:

> I. Whether the evidence offered at trial was insufficient to convict [Appellant] of aggravated assault under 18 Pa.C.S. § 2702(a)(1)?
>
> > a. Whether the Commonwealth failed to prove [Appellant] caused serious bodily injury intentionally, knowingly or recklessly under circumstances manifesting extreme indifference to the value of human life where the victim merely suffered a broken nose?
> >
> > b. Whether the Commonwealth failed to prove [Appellant] attempted to cause serious bodily injury to the victim where the Appellant engaged in a brief physical altercation with the victim, used only his hands and feet, did not use any weapon or implement, disengaged on his own volition, remained at the scene to casually converse with another person, and left the scene when his transportation arrived?
>
> II. Whether the trial court erred in denying Appellant's motion for mistrial after it sustained [Appellant's] Attorney's objection to the Commonwealth's question on cross examination regarding his post-arrest silence, attempting to

use [Appellant's] invocation of his constitutional right against self-incrimination guaranteed under the 5th amendment of the US Const and Section 9 of the Pennsylvania Constitution as evidence of his guilt of the offenses charged or the falsity of his testimony at trial.

III. Whether trial counsel was ineffective for failing to file a motion to sever the Appellant's trial from those of his codefendants under Pa.R.Crim.P. 563?

IV. Whether trial counsel was ineffective for not objecting to the Commonwealth's use of a witness to narrate a video recording of the altercation at issue when that witness did not observe the event she narrated?

(Appellant's Brief at 6-8).

In his first issue, Appellant argues that the Commonwealth failed to prove he caused serious bodily injury intentionally, knowingly, or recklessly under circumstances manifesting extreme indifference to human life, where the victim suffered only a broken nose. Appellant asserts that the Commonwealth also failed to prove he attempted to cause serious bodily injury where the evidence showed he engaged in a brief physical altercation with the victim, used only his hands and feet, did not use any weapon or implement, disengaged on his own volition, remained at the scene to casually converse with another person, and left the scene when his transportation arrived. Under these circumstances, Appellant concludes that the Commonwealth presented insufficient evidence to support his conviction for aggravated assault. We disagree.

In reviewing a challenge to the sufficiency of the evidence, our standard of review is as follows:

As a general matter, our standard of review of sufficiency claims requires that we evaluate the record in the light most favorable to the verdict winner giving the prosecution the benefit of all reasonable inferences to be drawn from the evidence. Evidence will be deemed sufficient to support the verdict when it establishes each material element of the crime charged and the commission thereof by the accused, beyond a reasonable doubt. Nevertheless, the Commonwealth need not establish guilt to a mathematical certainty. Any doubt about the defendant's guilt is to be resolved by the fact finder unless the evidence is so weak and inconclusive that, as a matter of law, no probability of fact can be drawn from the combined circumstances.

The Commonwealth may sustain its burden by means of wholly circumstantial evidence. Accordingly, the fact that the evidence establishing a defendant's participation in a crime is circumstantial does not preclude a conviction where the evidence coupled with the reasonable inferences drawn therefrom overcomes the presumption of innocence. Significantly, we may not substitute our judgment for that of the fact finder; thus, so long as the evidence adduced, accepted in the light most favorable to the Commonwealth, demonstrates the respective elements of a defendant's crimes beyond a reasonable doubt, the appellant's convictions will be upheld.

*Commonwealth v. Sebolka*, 205 A.3d 329, 336-37 (Pa.Super. 2019)

(quoting *Commonwealth v. Franklin*, 69 A.3d 719, 722-23 (Pa.Super. 2013)).

The Crimes Code defines aggravated assault as follows:

**§ 2702. Aggravated assault**

**(a) Offense defined.**—A person is guilty of aggravated assault if he:

(1) attempts to cause serious bodily injury to another, or causes such injury intentionally, knowingly or recklessly under circumstances manifesting extreme indifference to

the value of human life[.]

18 Pa.C.S.A. § 2702(a)(1). The Crimes Code defines "serious bodily injury" as "[b]odily injury which creates a substantial risk of death or which causes serious, permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ." 18 Pa.C.S.A. § 2301. Further, it is well-settled that the head is a "vital" part of the body. **Commonwealth v. Vandiver**, 599 Pa. 617, 628, 962 A.2d 1170, 1176 (2009). **See also Commonwealth v. Kinney**, 157 A.3d 968, 973 (Pa.Super. 2017) (holding that appellant's actions of repeatedly kicking and punching victim in head until he lost consciousness were sufficient to show attempt to cause serious bodily injury).

"When a victim actually sustains serious bodily injury, the Commonwealth can, but does not necessarily have to, establish specific intent to cause such harm." **Commonwealth v. Burton**, 2 A.3d 598, 602 (Pa.Super. 2010) (*en banc*), *appeal denied*, 613 Pa. 641, 32 A.3d 1275 (2011). "[T]he statute's intent requirement can be met if the defendant acts recklessly under circumstances manifesting an extreme indifference to human life." **Id.** "[F]or the degree of recklessness contained in the aggravated assault statute to occur, the offensive act must be performed under circumstances which almost assure that injury or death will ensue." **Commonwealth v. Packer**, 641 Pa. 391, 406, 168 A.3d 161, 170 (2017) (quoting **Commonwealth v. O'Hanlon**, 539 Pa. 478, 482, 653 A.2d 616, 618 (1995)).

In other words, the Commonwealth had to prove that [the defendant] acted with malice, or show

> that the defendant consciously disregarded an unjustified and extremely high risk that his actions might cause death or serious bodily harm. This state of mind may be inferred from conduct, recklessness of consequences, or the cruelty of the crime.

**Commonwealth v. Payne**, 868 A.2d 1257, 1261 (Pa.Super. 2005), *appeal denied*, 583 Pa. 681, 877 A.2d 461 (2005) (internal citations and quotation marks omitted).

Instantly, the trial court summarized the evidence supporting Appellant's aggravated assault conviction as follows:

> The victim, William Benton[,] … identified [Appellant]. [Mr. Benton] did not recall how many people were assaulting him or how many times he was hit. He testified that following the assault, he sustained a broken nose. Brian Wike testified … [that he] worked as a bouncer at a bar where the assault took place. He witnessed the attack on Mr. Benton. He testified that all three of the [d]efendants were punching and kicking the victim. They had him on the ground of the parking lot. They were repeatedly kicking and punching the victim's head. Mr. Wike testified that in his four and a half years of working as a bouncer he had seen many bar fights, but stated that this one was the worst. He described it as a "stomping."
>
> [The defense joint exhibit #1] is a video taken of the altercation as it took place in the parking lot outside the bar. Several witnesses described what is visible on the video while testifying. The jurors saw the video and watched [Appellant] kick [Mr. Benton] while he was on the ground. [Appellant] was identified in the video by Breeanna Kos, who was the bartender on duty the night of the incident and testified at trial on November 16, 2023. [Ms. Kos] viewed the video. She identified [Appellant] in the video as being

- 10 -

part of the group of individuals participating in the incident. Additionally, [Appellant] testified at trial and admitted to kicking [Mr. Benton] in the back several times when he was trying to help [Mr. Smida,] who he testified was being held by Mr. Benton.

(Trial Court Opinion, 7/24/24, at 4-5) (internal citations to the record omitted). The trial court concluded that the evidence was sufficient to support Appellant's aggravated assault conviction. We agree.

The record shows Appellant was identified by numerous witnesses as one of the participants in the assault and Appellant admitted to participating in the assault. (*See* N.T. Trial, 11/14/23, at 116; N.T. Trial 11/16/23, at 68, 92). During the assault, Appellant and his co-defendants repeatedly hit, kicked, and stomped on the victim's head. It is reasonable to conclude that such repeated blows and kicks, to a vital part of the body, created a substantial risk of death or serious, permanent disfigurement. *See Vandiver, supra*; 18 Pa.C.S.A. § 2301. Indeed, the victim suffered a broken nose.[7] Thus, despite Appellant's arguments that the assault was brief and that he "only" used his hands and feet, viewed in the light most favorable to the verdict-winner, the evidence was sufficient to sustain Appellant's conviction for aggravated assault. *See Burton, supra*; *Kinney, supra*. *See also Sebolka, supra*. Thus, Appellant's first issue merits no relief.

_____

[7] Appellant cites *Commonwealth v. Alexander*, 477 Pa. 190, 383 A.2d 887 (1978), to support his argument that a broken nose does not constitute serious bodily injury. However, *Alexander* is distinguishable: in that case, the Pennsylvania Supreme Court held that a **single** blow resulting in a broken nose was insufficient to support a conviction for aggravated assault. *See id.*

- 11 -

In Appellant's second issue, he contends that the trial court erred in denying his motion for a mistrial after the trial court referenced his post-arrest silence. Appellant argues that this was an impermissible attempt to use his invocation of his constitutional right against self-incrimination as guaranteed by the Fifth Amendment of the United States Constitution, and Section 9 of the Pennsylvania Constitution, as evidence of his guilt. According to Appellant, such error was not harmless and prejudiced him. We disagree.

Appellate review of the denial of a motion for mistrial implicates the following principles:

> A motion for mistrial is within the discretion of the trial court. A mistrial upon motion of one of the parties is required only when an incident is of such a nature that its unavoidable effect is to deprive the appellant of a fair and impartial trial. It is within the trial court's discretion to determine whether a defendant was prejudiced by the incident that is the basis of a motion for mistrial. On appeal, our standard of review is whether the trial court abused that discretion.
>
> An abuse of discretion is more than an error in judgment. On appeal, the trial court will not be found to have abused its discretion unless the record discloses that the judgment exercised by the trial court was manifestly unreasonable, or the result of partiality, prejudice, bias, or ill-will.

*Commonwealth v. Tejeda*, 834 A.2d 619, 623 (Pa.Super. 2003) (internal citations and quotation marks omitted).

Pennsylvania Rule of Criminal Procedure 605 provides, in pertinent part:

**Rule 605. Mistrial**

\*    \*    \*

(B) When an event prejudicial to the defendant occurs during trial only the defendant may move for a mistrial; the motion shall be made when the event is disclosed. Otherwise, the trial court may declare a mistrial only for reasons of manifest necessity.

\*   \*   \*

Pa.R.Crim.P. 605(B).  Pursuant to this rule, a motion for a mistrial is timely if it is "made when the alleged prejudicial event occurs."  **Commonwealth v. Boring**, 684 A.2d 561, 568 (Pa.Super. 1996), *appeal denied*, 547 Pa. 723, 689 A.2d 230 (1997).  "When an event prejudicial to a defendant occurs at trial, he may either object, requesting curative instructions, or move for a mistrial."  **Id.** (emphasis added).  An allegedly prejudicial event at trial requires a prompt objection from the defense and a request for a mistrial to preserve the issue for appellate review.  **Commonwealth v. Rhone**, 619 A.2d 1080 (Pa.Super. 1993), *appeal denied*, 534 Pa. 653, 627 A.2d 731 (1993).  If a defendant fails to move for a mistrial contemporaneously with the allegedly prejudicial incident at trial, "any potential claim is waived and the defendant is entitled to relief only if the trial judge finds a new trial to be a 'manifest necessity.'"  **Commonwealth v. Montalvo**, 641 A.2d 1176, 1188 (Pa.Super. 1994).  "Reviewing courts use no mechanical formula in determining whether a trial court had a manifest need to declare a mistrial.  Rather, '...varying and often unique situations aris[e] during the course of a criminal trial...[and] the broad discretion reserved to the trial judge in such circumstances has been consistently reiterated....'"  **Commonwealth v. Leister**, 712 A.2d 332, 335 (Pa.Super. 1998), *appeal denied*, 557 Pa. 627, 732 A.2d 613 (1998) (internal

- 13 -

citations omitted).

The Court has previously instructed that "[a]n accused's Fifth Amendment right to remain silent after arrest is unequivocal. Any mention of the fact that a defendant availed himself of that protection must be scrupulously avoided." *Commonwealth v. Williams*, 442 A.2d 314, 316 (Pa.Super. 1982). Further, "testimonial reference to a defendant's post-arrest silence is constitutionally off-limits; even a single reference, as reflected, risks reducing to rubble an entire prosecution." *Commonwealth v. Rivera*, ___ Pa. ___, ___, 296 A.3d 1141, 1157 (2023). However, while such references are prohibited and may constitute reversible error, they are still subject to harmless error analysis:

> [H]armless error exists [if] … (1) the error did not prejudice the defendant or the prejudice was *de minimis*; or (2) the erroneously admitted evidence was merely cumulative of other untainted evidence which was substantially similar to the erroneously admitted evidence; or (3) the properly admitted and uncontradicted evidence of guilt was so overwhelming and the prejudicial effect of the error was so insignificant by comparison that the error could not have contributed to the verdict.

*Id*. at 1146 (internal citations omitted; brackets in original).

Instantly, the trial court reasoned:

> During his direct examination, [Appellant] stated that he was walking away and [Mr. Benton[8]] got him in a chokehold and held him for 10-15 seconds. [Appellant] stated that he

---

[8] This section of the trial court's opinion variously refers to the victim as "William Bennett." However, an examination of the record confirms that his name is William Benton.

was frightened and had to catch his breath once he was released. According to [Appellant], this encounter was unprovoked and he was just trying to find a ride and get home. Additionally, [Appellant] stated that [Mr. Benton] grabbed [Mr. Smida] from behind and that [Appellant] punched [Mr. Benton] in an effort to protect his friend. [Appellant] then testified to kicking [Mr. Benton] three (3) times in the back until [Mr. Benton] let go of [Mr. Smida]. [Appellant] did not give a statement to the police following the incident. On cross-examination, the Commonwealth attempted to discredit [Appellant's] testimony by pointing out that he had not previously told anyone that [Mr. Benton] had, in fact, assaulted him.

**[COMMONWEALTH]**: And you also said that Mr. Benton held you in a lock?

**[APPELLANT]**: Yes.

**[COMMONWEALTH]**: But this is the first time you said that; right?

**[APPELLANT]**: Say that again?

**[COMMONWEALTH]**: This is the first time that you even [told] anyone that Mr. Benton attacked you?

**[DEFENSE COUNSEL]**: Judge, I'm going to object. Can we approach?

**[THE COURT]**: Yes.

**[SIDEBAR BEGINS]**

**[DEFENSE COUNSEL]**: I just think the question is confusing for him because he has told people that before, and he's told me that before. So I don't want him to answer—it's different if this is like the first time you're testifying about it, but he has told people that before, so there were two difference questions.

[(N.T. Trial, 11/16/23, at 75-77).]

The defense was not initially objecting to the question as

- 15 -

one infringing on [Appellant's] right to remain silent. Counsel only made the argument and request for a mistrial once the [c]ourt cautioned the prosecution asking overly broad questions about [Appellant's] claim of being a victim. During a lengthy sidebar discussion, the Commonwealth was cautioned about pursuing this line of questioning. The motion for mistrial was made. Co-counsel for the prosecution argued that the question was probing [Appellant's] credibility since the jury had heard he spoke to Mr. Wike after the assaults and Mr. Wike had testified. Mr. Wike did not testify that [Appellant] told him of being choked. The [c]ourt denied the motion for mistrial. [Defense counsel] asked for a cautionary instruction. In accordance with [defense counsel's] request, the [c]ourt provided said instruction.

Ladies and gentlemen of the Jury, I am sustaining an objection that was made to the last question, and you're to disregard any answer. I don't think [Appellant] got an answer out. But quite simply, you know this because I've told you this when you were at jury selection. I told you this in my opening remarks, and I'll tell you again in closing instructions, a defendant has an absolute right to remain silent. They do not have to report anything to the authorities. In fact, if a Defendant chooses to testify, then they are subject to cross-examination, but you can never draw an adverse inference from someone who chooses to exercise that right to remain silent that we all enjoy as American citizens ....

(Trial Court Opinion at 8-10).

Ultimately, the trial court concluded that any reference to Appellant's post-arrest silence constituted harmless error, given the questions, Appellant's response, and the court's curative instructions. The court noted:

Frankly, the Commonwealth's questions confused the witness and did not elicit a substantive response. The curative instruction was given immediately following the objection. This [c]ourt cannot conclude that the Commonwealth's questions about [Appellant's] failure to

report to the police contributed to the verdict.

(*Id.* at 10-11).  The record supports the trial court's conclusions.

Initially, we note that Appellant's failure to make a timely and specific objection **on the basis of a Fifth Amendment violation** constitutes waiver of this issue on appeal.  *See Montalvo, supra*.  However, even if not waived, this issue would not warrant relief.  In this case, the inadvertent reference to Appellant's post-arrest silence was harmless error, as "the properly admitted and uncontradicted evidence of guilt was so overwhelming and the prejudicial effect of the error was so insignificant by comparison that the error could not have contributed to the verdict."  *See Rivera, supra*.  As noted above, the evidence introduced at trial established, through multiple eyewitnesses as well as security footage, that Appellant and his co-defendants kicked, punched, and stomped the victim following an altercation.  Therefore, the court did not abuse its discretion in denying Appellant's motion for a mistrial.  *See Tejeda, supra*.  Thus, Appellant's second issue on appeal is waived and merits no relief in any event.

Appellant's final two issues concern questions of ineffective assistance of counsel.  We decline to address them at this time, as claims of ineffective assistance of counsel generally must be deferred to post-conviction collateral review.[9]  *See Commonwealth v. Holmes*, 621 Pa. 595, 79 A.3d 562 (2013) (holding that, subject to limited exceptions, claims of ineffective assistance of counsel are to be deferred to PCRA review; trial courts should not entertain

---

[9] *See* Post Conviction Relief Act ("PCRA"), 42 Pa.C.S.A. §§ 9541-9546.

claims of ineffectiveness upon post-verdict motions; and such claims should not be reviewed upon direct appeal). The first exception applies to extraordinary circumstances, when a "trial court, in the exercise of its discretion, determines that a claim … of ineffectiveness is both meritorious and apparent from the record so that immediate consideration and relief is warranted." ***Id.*** at 621, 79 A.3d at 577. The second exception addresses "multiple and fairly common ineffectiveness claims," which are accompanied by the defendant's "knowing, voluntary, and express waiver of [PCRA] review." ***Id.*** at 621-22, 79 A.3d at 577-78, 580. The third exception requires "trial courts to address claims challenging trial counsel's performance where the defendant is statutorily precluded from obtaining subsequent PCRA review." ***See Commonwealth v. Delgros***, 646 Pa. 27, 42, 183 A.3d 352, 361 (2018). None of the enumerated exceptions apply here. Therefore, Appellant must defer these claims to collateral review. ***See id.***; ***Holmes, supra***. Accordingly, we affirm.

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 05/30/2025